**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

**BRUCE A. BOHLMANN**                                                                      **PLAINTIFF**

v.                                    **CASE NO. 5:11CV00115 BSM**

**UNITED STATES DEPARTMENT
OF THE ARMY
Secretary, John M. McHugh**                                                              **DEFENDANT**

## ORDER

The motion for summary judgment [Doc. No. 7] of defendant United States Department of the Army is granted.

### I. BACKGROUND

Viewed in the light most favorable to Bruce Bohlmann, the non-moving party, the undisputed facts are as follows.

On June 9, 1997, Bohlmann, a white male, was hired by defendant United States Department of the Army ("Army"), upon the recommendation of Chief James Anderson, to serve as a GS-0085 security guard at the Army's Pine Bluff Arsenal (PBA) in Pine Bluff, Arkansas. Plaintiff's Statement of Undisputed Material Facts [Doc. No. 46] ("Pl's SUF"), ¶ 1. As a civilian employee, Bohlmann was subject to yearly "base system civilian evaluation reports," which rate various aspects of job performance over the course of a year. Pl's SUF ¶ 6. As a GS-0085 security guard, Bohlmann was required to enroll in and maintain certification with the Army's Chemical Personnel Reliability Program (CPRP). Response to Defendant's Motion for Summary Judgment, Defendant's Statement of Pertinent Facts [Doc.

No. 47] ("Pl's Resp. to Def's SUF"), ¶¶ 2-3.

The CPRP is a tool used by commanders and directors to ensure that persons with access to chemical surety material meet high standards of reliability. *Id.* at ¶ 4. Certification in the CPRP is a principal requirement for GS-0085 security guards, as they are chartered with providing a safe and secure environment for chemical munitions at PBA and are held to a much higher standard than ordinary "rank and file" employees. *Id.* at ¶ 2.

Army Regulation 50-6 (AR50-6) establishes the CPRP's dependable and reliability standards and requires that CPRP employees be reevaluated and cleared every five years. Pl's SUF ¶ 4. The determination of an individual's reliability and whether he will be retained in a CPRP position rests with the certifying official, subject to review by the reviewing official. Pl.'s Resp to Def's SUF ¶ 6(a). At all times relevant, Bohlmann's chief supervisor and CPRP certifying official was Chief Anderson. Pl's SUF ¶ 2.

Bohlmann received his CPRP certification shortly after being hired in 1997 and passed his first five-year CPRP revaluation in 2002. Pl's SUF ¶ 3. On March 9, 2005, however, he was cited for "[t]hreatening or attempting to inflict bodily harm without bodily contact" when he told a fellow officer that he "better watch his back." Pl's Resp. to Def's SUF ¶ 7(h); Defendant's Memorandum in Support of Motion to Dismiss, or in the Alternative, for Summary Judgment, Statement of Pertinent Facts [Doc. No. 8] ("Def's SUF"), ¶ 7; Defendant's Attached Exhibit 5 [Doc. No. 8-7] ("Def's Ex. 5") at 201. A year later, on February 25, 2006, Bohlmann was verbally counseled for failing to perform assigned duties. Pl's Resp. to Def's SUF ¶ 7(g); Def's SUF ¶ 7; Def's Ex. 5 at 198.

Seven months after being counseled, in September of 2006, Bohlmann received excellent ratings by supervisors, John Dickinson and Chief Anderson, in his 2005-2006 job performance evaluation. [Doc. 47-2]. In June of 2007, he passed his second five-year CPRP revaluation. Pl's SUF ¶ 5. Two months later, in August 2007, Sergeant Bernard Caruthers and Lieutenant Robert Merriweather gave him excellent ratings in his job performance evaluation for 2006-2007. [Doc. No. 47-3].

On January 15, 2008, Bohlmann was given a written reprimand by Chief Anderson which was later withdrawn. Pl's SUF at ¶ 7(d); Def's SUF ¶ 7; Def's Ex. 5 at 192-96. On April 15, 2008, Commander Shade Culclager issued a memorandum stating that he witnessed Bohlmann making a negative statement about superior officers. Pl's SUF at ¶ 7(c); Def's SUF ¶ 7; Def's Ex. 5 at 191. In August of 2008, Sergeant Caruthers and Lieutenant Merriweather gave Bohlmann excellent ratings for his 2007-2008 job evaluation. [Doc. No. 47-4].

On November 20, 2008, Lieutenant Merriweather prepared a memorandum stating that Bohlmann had been given a "letter of concern" for failing to follow written regulations, orders, rules and procedures while in a leadership position. Pl's SUF at ¶ 7(b); Def's SUF ¶ 7; Def's Ex. 5 at 189. On January 12, 2009, Sergeant Caruthers remarked in Bohlmann's quarterly counseling report that Bohlmann failed to check and report an unsafe condition relating to a 72 inch culvert in a restricted area, and he was being issued a written warning. Pl's SUF at ¶ 7(a); Def's SUF ¶ 7; Def's Ex. 5 at 186-88.

On February 1, 2009, Sergeant Caruthers asked Bohlmann to take his place as Range

Safety Officer at the PBA firing range. Pl's SUF ¶ 9. Bohlmann agreed but asked for assurance that security guard and field training officer Chickilah Davenport, a black female, would not be there. *Id.* at ¶ 39. This was because Davenport had filed a sexual harassment complaint against Bohlmann and five other white security guards approximately four and a half years earlier (which was ultimately dismissed). *Id*. Although Davenport's duties included assisting with training at the firing range, Sergeant Caruthers stated that he had no reason to think she would be there. *Id.* at ¶ 9; Def's SUF ¶¶ 9-10.

Assuming Officer Davenport would not be there, Bohlmann reported to the PBA firing range. Pl's SUF ¶ 11. After about an hour, Davenport came to the range. *Id.* Bohlmann called Sergeant Caruthers to inform him of Davenport's presence and stated he would not open the firing range until she left. *Id.* Sergeant Caruthers instructed Bohlmann to have Davenport call him which Bohlmann did. *Id.* at ¶ 13. About ten minutes later, as the eight shooters on the firing range were getting prepared to shoot, Bohlmann noticed that Davenport was still present, so he approached her. *Id.* at ¶¶ 14, 25. At the time, Bohlmann was carrying his unloaded pistol and Davenport possessed a loaded pistol. Pl's SUF ¶ 24.

Bohlmann, citing his agreement with Sergean Caruthers, asked Davenport to leave the firing range. *Id.* at ¶ 14. Davenport refused, stating she was authorized to be there as a field training officer. *Id.*; Def's SUF ¶ 14; Attached Exhibit 6 [Doc. No. 8-25] ("Def. Ex. 6") at 49. At some point, Bohlmann left and contacted Sergeant Caruthers to inform him of the situation. Pl's SUF at ¶ 14. Sergeant Caruthers arrived about five minutes later, took over for Bohlmann, and instructed him to return to his patrol duties. *Id.* at ¶ 16.

An investigation of the shooting range incident was conducted and statements were taken from eleven witnesses. Def's SUF ¶ 17. On February 2, 2009, Bohlmann's second line supervisor, Lieutenant Merriweather, proposed that Bohlmann be terminated. Pl's SUF ¶ 26. In a memorandum, Merriweather describes Bohlmann's behavior as rude, inappropriate, and in violation of Army Regulation 50-6, Paragraph 2-8(d) ("inappropriate attitude, conduct, or behavior"). *Id.*; Def's SUF, Attached Exhibit 8 [Doc. No. 8-10] ("Def's Ex. 8") at 1-2. The memorandum states that Bohlmann's actions appear to be in retaliation for Davenport's sexual harassment claim against him and that "BOHLMANN has exhibited a pattern of job performance problems over a period of time." Pl's SUF ¶ 26; Def's Ex. 8 at 1-2. It lists eleven specific incidents of poor job performance. Pl's SUF ¶ 26; Def's Ex. 8 at 1-2.

Lieutenant Merriweather's memorandum was forwarded to and signed by Bohlmann's third, fourth, and fifth line supervisors: Captain Culclager, Chief Anderson, and Director Donald Police. Pl's SUF ¶ 26. Chief Anderson then sent Bohlmann a memorandum on February 2, 2009, notifying him that he was being placed on CPRP administrative restriction. *Id.* at ¶ 32. Consequently, Bohlmann was restricted from performing CPRP duties and working overtime. Def's SUF ¶ 19. He was also required to turn in his weapon and directed to attend anger management classes. *Id.* at ¶¶ 18-19; Pl's SUF ¶45.

On February 23, 2009, Bohlmann filed an informal EEO complaint of discrimination with the PBA EEO Office. Def's SUF at ¶ 21. On March 1, Captain Culclager reduced Lieutenant Merriweather's proposal for termination to a written reprimand. Pl's SUF at ¶ 33. The letter of reprimand states that Bohlmann's conduct at the shooting range was

"disruptive," "threatening," and in violation of various CPRP provisions. *Id.* at ¶ 34.

On April 1 2009, Chief Anderson, Bohlmann's CPRP certifying official, received notice of Dr. Kimberly Beck's determination that there was nothing medically to worry about regarding Bohlmann's anger. Pl's SUF ¶ 46. Dr. Beck is the PBA's Chief Medical Officer. *Id.* On April 6, 2009, Chief Anderson recommended the permanent disqualification of Bohlmann from the CPRP. *Id.* at ¶¶ 44, 46. Chief Anderson's proposal was rejected on May 18, 2009, by Colonel William Barnett, Bohlmann's CPRP reviewing official. *Id.* at ¶ 44.

On June 18, 2009, an EEO fact finding conference was held. *Id.* at ¶ 47. On June 30, 2009, Chief Anderson, after conferring with Director Police, changed Bohlmann's still-in-place CPRP administrative restriction to a 180-day CPRP suspension "pending evaluation of issues related to [] inappropriate attitude, conduct, or behavior." *Id.* at ¶¶ 50, 52. Chief Anderson issued memoranda on December 28, 2009, January 27, 2010, and February 26, 2010, extending Bohlmann's CPRP suspension for additional thirty-day periods. *Id.* at ¶ 53.

On March 30, 2010, Chief Anderson informed Bohlmann his CPRP suspension was cancelled and he was eligible to get his weapons restored. *Id.* at ¶ 55. On April 5, 2010, Chief Anderson notified Bohlmann that he was being placed on CPRP restriction pending PBA Command Group review of his reassignment to a position outside the GS-0085 security guard position. *Id.* at ¶ 56. On May 10, 2011, Bohlmann initiated this lawsuit against the Army. Plaintiff's Complaint [Doc. No. 1] ("Pl's Compl."). He claims disparate treatment based on his race and sex in violation of 42 U.S.C. § 2000e-2(a)(1) and unlawful retaliation in violation of 42 U.S.C. § 2000e-3(a). Pl's Compl. ¶¶ 36-40.

## II. SUMMARY JUDGMENT STANDARD

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law." *Nelson v. Corr. Med. Servs.*, 533 F.3d 958, 961 (8th Cir. 2008) (citing Fed. R. Civ. P. 56; *Brown v. Fortner*, 518 F.3d 552, 558 (8th Cir. 2008)). Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of her pleadings, but her response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 247-48 (1986).

The plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In considering a motion for summary judgment, all reasonable inferences must be drawn in the light most favorable to the nonmoving party. *Holland v. Sam's Club*, 487 F.3d 641, 643 (8th Cir. 2007). The evidence is not weighed, and no credibility determinations are made. *Jenkins v. Winter,* 540 F.3d 742, 750 (8th Cir. 2008).

III. DISCUSSION

The Army's motion for summary judgment [Doc. No. 7] is granted. Bohlmann alleges the Army intentionally discriminated against him based on his race and sex when, after the shooting range incident on February 1, 2009, it reprimanded him, directed him to attend anger management classes, removed his weapon, and administratively restricted and suspended him from the CPRP. Pl's Compl. ¶¶ 36, 38-40. Bohlmann alleges Chief Anderson retaliated against him by extending his CPRP suspension merely because he initiated and participated in the EEO process. Pl's Compl. ¶ 37.

There is no direct evidence of discrimination or retaliation. Bohlmann's claims are therefore analyzed under the three-stage, *McDonnell Douglas* burden-shifting analysis. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). Bohlmann bears the initial burden of producing sufficient evidence establishing a prima facie case of discrimination and retaliation. *Id.* at 802. Then the burden shifts to the Army, who must rebut Bohlmann's prima facie case by articulating a legitimate, non-discriminatory reason for its employment decisions. *Texas Dep't Of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). If the Army provides a legitimate, non-discriminatory reason for its employment decisions, then Bohlmann must produce evidence showing that the Army's non-discriminatory reason is a pretext for discrimination and retaliation. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *Elam v. Regions Financial Corp.*, 601 F.3d 873, 879 (8th Cir. 2010).

A.   <u>Pretext</u>

Although it is questionable whether Bohlmann can establish a prima facie case of either discrimination or retaliation, it is clear Bohlmann has not shown that the Army's reasons for disciplining him are pretext for discrimination. The Army has set forth two key legitimate non-discriminatory reasons for disciplining Bohlman, including: (1) his abuse of his authority as shooting range officer on February 1, 2009, in an apparent attempt to retaliate against a co-worker who had previously filed a sexual harassment complaint against him by insisting, without justification, that she leave the range and refusing to open the range while she was present; and (2) his pattern of job performance problems over a period of time. [Doc. No. 8-10] (Chief Merriweather's memorandum recommending Bohlmann's termination); [Doc. No. 8-1] at pgs 34-36, 39 (sworn testimony from Chief Anderson); Pl's SUF ¶ 46; [Doc. No. 8-13] (Chief Anderson's memorandum recommending Bohlmann's disqualification from the CPRP).

To overcome these reasons, Bohlmann must show that they are a pretext for discrimination or that unlawful discrimination or retaliation was a motivating factor in the adverse employment actions. *See McCullough v. University of Ark. for Med. Scis.*, 559 F.3d 855, 860-61 (8th Cir. 2007). "The critical inquiry is not whether the employee actually engaged in the conduct [. . .] but whether the employer in good faith believed that the employee was guilty of the conduct justifying [the adverse employment action]." *Id.* at 861-62. "A plaintiff seeking to survive an employer's motion for summary judgment must therefore show a genuine issue for trial about whether the employer acted based on an intent to discriminate rather than on a good-faith belief that the employee committed misconduct

9

justifying [the adverse employment action]." *Id.* at 862.

Bohlmann has failed to raise a genuine issue of material fact as to whether Chief Anderson or the other Army officials truly believed that he engaged in the conduct justifying the Army's reasons for disciplining him.

### *1. Bohlmann's conduct at the shooting range*

The conduct underlying the first proffered reason for disciplining Bohlmann is his behavior at the shooting range on February 1, 2009, which is confirmed by multiple witnesses, *see* [Doc. No. 8-25], as well as Bohlmann himself. Pl's SUF ¶¶ 8-16, 24-25. While Bohlmann disagrees with certain details, he admits to (1) confronting Davenport at the shooting range where live ammunition and weapons were present; (2) refusing to open the range until she left; and (3) having no justification for instructing her to leave other than his superior's statement that he did not think Davenport would be there. *See id.* Although the record is devoid of anything substantiating the Army's suspicion that Bohlmann instigated the confrontation with Davenport in retaliation for filing the sexual harassment claim, nothing indicates that the Army's suspicion of retaliation was made in bad faith. *Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 470-71 (8th cir. 2011) (stating the general principle that a court "may not second-guess an employer's personnel decisions, even inefficient ones, so long as they do not discriminate unlawfully") (quoting *Hanebrink v. Brown Shoe Co.*, 110 F.3d 644, 646 (8th Cir. 1997)).

### *2. Bohlmann's pattern of performance problems*

Bohlmann has similarly failed to produce evidence raising a genuine issue of material

fact as to whether the Army lacked a good faith belief that Bohlmann's performance justified suspending him from the CPRP. Eleven specific incidents of job performance problems are listed in Lieutenant Merriweather's memorandum. [Doc. No. 8-10]. These incidents are supported by multiple documents produced by the Army. *See* [Doc. No. 8-7]. Indeed, Bohlmann admits to: (1) threatening a fellow officer on March 9, 2005; (2) failing to perform assigned duties on February 25, 2006; (3) receiving a memorandum on April 15, 2008, acknowledging that he made a negative statement about superior officers; (4) receiving a letter of concern in November of 2008 for failing to follow written regulations, orders, rules and procedures while in a leadership position; and (5) receiving remarks in his quarterly counseling report on January 12, 2009, indicating that he failed to check and report an unsafe condition in a restricted area. *See* Pl's Resp. to Def's SUF ¶¶ 7(a)-(d); 7(g)-(h).

In asserting that the non-discriminatory reasons proffered by the Army are pretext, Bohlmann points out that he received excellent ratings in three yearly performance evaluation reports covering 2005 to 2008 and that he passed two CPRP reevaluations in 2002 and 2007. *See* [Doc. Nos. 47-2, 47-3, 47-4]. The three yearly evaluation reports are not relevant to the analysis, however, because yearly performance appraisals are given to all civilian PBA employees and are separate and distinct from the more specific and intensive evaluations given to CPRP employees. *See id.*; Pl's SUF ¶ 6; Pl's Resp. to Def's SUF ¶¶ 2-3.

As for the CPRP revaluations, they do not apply because they only show he was performing to CPRP standards through June of 2007. Further, neither of these evaluations raises a genuine issue of material fact because the Army has not alleged that it disciplined

11

Bohlmann for a one specific act. Its position is that, given the eleven incidents of performance problems, culminating with events occurring after 2007, it determined that Bohlmann no longer possessed the CPRP's high standards of reliability and trustworthiness. *See* [Doc. No. 8-1] at pgs 34-36, 39 (sworn testimony from Chief Anderson); Pl's SUF ¶ 46; [Doc. No. 8-13] (Chief Anderson's memorandum recommending Bohlmann's disqualification from the CPRP); [Doc. No. 8-10] (Lieutenant Merriweather's memorandum recommending Bohlmann's termination, signed by Chief Anderson).

### *3. Race or Sex Discrimination*

Bohlmann has also failed to produce any evidence that raises a genuine issue of material fact as to whether the Army's challenged employment actions were based on Bohlmann's race and/or sex or that the Army's decisions were made in retaliation for his protected EEO activity. Bohlmann attempts to show that race and/or sex motivated the Army's decisions regarding the discipline he received by showing the lack of discipline received by other similarly situated black females. Bohlmann's asserts that, in December of 2008, Davenport and Officer Estine Mallett, a black female, had a confrontation similar to the one he had with Davenport at the firing range, but that neither one was reprimanded in any way from the CPRP (although both were directed to attend anger management). Pl's Compl. ¶ 17. Bohlmann also alleges that on two occasions, Davenport made insubordinate and inappropriate comments toward superior officers but was not disciplined for them. *Id.* at ¶ 16.

At the pretext stage, to be "similarly situated," employees must be similarly situated

in "all relevant aspects." *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir.2000). "Specifically, the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and *engaged in the same conduct without any mitigating or distinguishing circumstances.*" *Id.* (emphasis supplied).

While Bohlmann has shown that Davenport and Mallet are both CPRP-certified security guards who were disciplined differently, he has failed to show that they "engaged in the same conduct without any mitigating or distinguishing circumstances." *See id.* This is true for a number of reasons. First, it is undisputed that the Davenport-Mallett argument did not occur at a shooting range where live ammunition and weapons were present. Chief Anderson stated at the EEO fact-finding conference that this factor, along with Bohlmann's extensive history of performance and disciplinary problems, was critical to the strong nature of the punishment given Bohlmann. [Doc. No. 8-1] at pg 46 (sworn testimony from Chief Anderson). Second, as indicated in Lieutenant Merriweather's memorandum, Bohlmann's superiors suspected that his argument with Davenport was an attempt to retaliate against her for previously filing a sexual harassment claim against him. *See* [Doc. No. 8-10] (Lieutenant Merriweather's memorandum). This suspected retaliation, which could have exposed the Army to legal liability if substantiated, further distinguishes the Bohlmann-Davenport argument from the Davenport-Mallett argument. Third, in the Davenport-Mallett argument, it was never determined who the aggressor was, *see* [Doc. No. 1] at pgs. 85-86 (sworn testimony of Director Police), whereas Bohlmann was determined to be the aggressor in his argument with Davenport, *see* [Doc. No. 8-10]. Fourth, unlike Davenport and Mallett,

Bohlmann has had a more extensive history of discipline and performance issues, and there is no allegation that either Mallet or Davenport has a disciplinary record similar to Bohlmann's. *See Tolen v. Ashcroft*, 377 F.3d 879, 883 (8th Cir. 2004) (stating that "the frequency of [the plaintiff's] misconduct distinguishe[d] him from his comparables" in holding that the plaintiff failed to establish a prima facie case of race discrimination).

Bohlmann's second pretext argument is that Davenport made insubordinate and discourteous remarks toward superior officers and was not disciplined for them. Pl's Compl. ¶ 16. Taking this allegation as true, there is still no genuine issue of material fact as to whether these remarks, for purposes of pretext, constitute "the same conduct" as Bohlamann's. These remarks were not made at a shooting range where live ammunition and weapons were present, were not suspected to have been made in retaliation for protected EEO activity, and Davenport has not been shown to have had a similar history of disciplinary and performance problems as Bohlmann. As such, Bohlmann's evidence fails to raise a genuine issue of material fact as to whether Bohlmann's race or sex played a motivating factor in the adverse employment actions.

Finally, there are two final indicators that neither race nor sex played a role in Bohlmann's discipline. First, Chief Anderson was the main official making the employment decisions, and he is of the same race and sex as Bohlmann. *See, e.g., Scott v. McHugh*, 2011 WL 1464853, *4 (E.D. Ark. 2011) (citing *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) (difficult for a plaintiff to prove discrimination when decision-makers fall[] within plaintiff's protected class)). While Bohlmann alleges that Chief Anderson was

actually a "cat's paw" for Bohlmann's black supervisors, nothing in the record supports this contention. Conversely, the undisputed record indicates that Chief Anderson decided for himself that he no longer trusted Bohlmann to serve in a CPRP position and did not believe he was reliable to "secure [. . .] weapons of mass destruction." [Doc. No. 8-1] at pgs. 34-35; *see* [Doc. No. 8-13] (Chief Anderson's memorandum recommending Bolhmann's permanent disqualification from the CPRP).

Second, Chief Anderson was also the person who hired Bohlmann, which "suggests that he was not motivated to discriminate against white men when he later recommended the adverse actions taken against Bohlmann." *Clark v. Johanns*, 460 F.3d 1064, 1068 (8th Cir. 2006). Although it is true that this same actor evidence is weakened by the fact that the adverse employment action was taken approximately twelve years after Bohlmann was hired, this evidence is simply one more factor indicating that Bohlmann has failed to show that he was disciplined due to his race and sex.

### *4. Retaliation*

Bohlmann has similarly failed to raise a genuine issue of material fact as to whether Chief Anderson's decision to extend his CPRP suspension for 30-day periods was in retaliation for Bohlmann initiating and participating in the EEO process. First, Chief Anderson put in place the original, indefinite CPRP restriction on February 2, 2009, which was three weeks before Bohlmann initiated the EEO process on February 23, 2009. The record indicates that when Chief Anderson put in place that CPRP restriction, he had determined that Bohlmann no longer met the standards of reliability and trustworthiness

demanded of a security guard working in a CPRP position. *See* [Doc. No. 8-1] at pgs. 34-36, 39; [Doc. No. 8-13]; [Doc. No. 8-10]. This undercuts Bohlmann's claim. *See Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 504 (8th Cir. 2005) ("Evidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation."); *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 793 (8th Cir. 2004) (same); *Smith v. Ashland, Inc.,* 250 F.3d 1167, 1174 (8th Cir. 2001) (same). Furthermore, the undisputed record indicates that Chief Anderson extended Bohlmann's CPRP suspension for the very same reasons he placed Bohlamnn on CPRP restriction in the first place; he no longer trusted Bohlmann to work as a CPRP security guard entrusted with securing chemical weaponry. *See* [Doc. No. 8-9] at pgs. 284-85, 294-95 (sworn testimony of Chief Anderson).

Second, any inference of retaliation is further weakened by the more than ten month time frame between Bohlmann first initiating protected activity on February 23, 2009, and Chief Anderson later extending his CPRP suspension on December 28, 2009, which Bohlmann alleges was retaliatory. It is well established that a "mere coincidence of timing" can rarely be sufficient to establish a triable claim of unlawful retaliation. *Kipp v. Missouri Highway and Transp. Com'n*, 280 F.3d 893, 897 (8th Cir. 2002) (collecting cases); *see Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) ("Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation."). Only in very limited circumstances, when the temporal proximity between the protected activity and adverse

employment action is very close, could a plaintiff potentially rely solely on timing as a basis for establishing the requisite causal connection. *See generally, Kipp*, 280 F.3d at 897. It has been held that a temporal connection of two months "so dilutes any inference of causation" that as a matter of law it could not justify an inference of causation. *Id.*; *see Shanklin v. Fitzgerald*, 397 F.3d 596, 604 (8th Cir. 2005) (holding that where the interval between the protected activity and adverse employment action is ten months, "any causal nexus inference tends to evaporate").

## IV. CONCLUSION

For the reasons set forth above, the Army's motion for summary judgment [Doc. No. 7] is granted and Bohlmann's claims are dismissed with prejudice.

IT IS SO ORDERED this 28th day of September 2012.

*/s/ Brian S. Miller*
UNITED STATES DISTRICT JUDGE